IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALVIN HINES, | § | |
| | § | |
| Defendant Below, | § | No. 203, 2022 |
| Appellant, | § | |
| | § | |
| v. | § | |
| | § | Court Below: Superior Court |
| STATE OF DELAWARE, | § | of the State of Delaware |
| | § | |
| Appellee. | § | I.D. No. 2001014339 (N) |

Submitted: January 25, 2023
Decided: February 6, 2023

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

James O. Turner, Esquire, Office of the Public Defender, Wilmington, Delaware for Appellant.

Julie M. Donoghue, Esquire, Delaware Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

This is an appeal of an August 12, 2021 oral bench ruling by the Superior Court denying a motion for judgment of acquittal by Alvin Hines ("Hines"). A grand jury indicted Hines on three counts: (1) Possession of a Weapon with a Removed, Obliterated or Altered Serial Number (the "Serial Number Charge"), (2) Possession of a Firearm While Under the Influence (the "Drug Charge"), and (3) Discharging a Firearm on a Street. Following a two-day jury trial, the jury returned guilty verdicts on the first two counts.[1]

Hines was sentenced to three years at Level 5, suspended for one year at Level 2 for the Serial Number Charge and to one year at Level 5, suspended for one year at Level 2 for the Drug Charge. During his trial, Hines moved for judgment of acquittal on the Serial Number Charge following the State's case-in-chief. The trial court denied Hines' motion.

Hines appeals the denial of his motion for judgment of acquittal. Hines argues that the Superior Court erred because the evidence was insufficient to show that he knew that the firearm at issue had an obliterated serial number.

We find Hines' appeal to be without merit. Trial testimony put forward by the State demonstrated that Hines was found holding a high point nine-millimeter firearm in the exact area where shots were fired. Three nine-millimeter shell casings were found in that same area, matching the ammunition compatible with that firearm. At least two police officers testified that someone holding that firearm would know its serial number had been removed. Because we conclude that sufficient evidence existed for the jury to infer that

---

[1] The State dismissed count three before trial.

2

Hines knew about the obliterated serial number, we AFFIRM the Superior Court's denial of Hines' motion for judgment of acquittal.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[2]

The Wilmington Police Department ("WPD") makes use of what is known as a "shot-spotter" system.[3] The shot-spotter system is deployed throughout Wilmington and is used to detect gunfire. When shots are detected, the system geo-locates the sound and alerts WPD officers. Those officers are then able to respond to the area where gunfire was recorded. On the evening of January 21, 2020, the shot-spotter system detected gunfire near the 500 block of West 27th Street in Wilmington. Two shots were detected on the system. WPD officer Akquil Williams ("Patrolman Williams") responded. He located a man standing in the same area and approached him. As Patrolman Williams approached, he asked the man if he had heard any gunshots. The man responded that he had.

Patrolman Williams then noticed a black firearm in the man's right hand. Upon seeing the firearm, Patrolman Williams pulled out his WPD-issued weapon and ordered the man — later identified as Hines — to drop the firearm. Patrolman Williams gave this order several times before Hines complied. Fellow WPD officer, Corporal Daniel Humphrey ("Corporal Humphrey"), was also on duty that night and responded to the same shot-spotter notification. As Corporal Humphrey approached, he heard Patrolman

---

[2] The facts, except as otherwise noted, are taken from the trial transcript and the court's oral ruling denying the motion for judgment of acquittal. *See* A008–282 (Trial Tran.).

[3] A036 (Akquil Williams Trial Test. at 29:8–12) (stating that "Shot Spotter is a system that the city uses to detect gunfire" and that "[i]t pops up on our computer when they detect shots fired in a certain area and it pin drops exactly where the gunfire is coming from.") [hereinafter Williams Test. at _].

3

Williams ordering Hines to drop his weapon, and Corporal Humphrey pulled out his firearm and also ordered Hines to drop the weapon.

Hines eventually dropped the firearm from his right hand. During his interaction with Hines, Patrolman Williams observed that Hines "seemed like he wasn't really picking up on my commands at first[.]"[4] This led Patrolman Williams to suspect that Hines was under the influence of alcohol or drugs. Corporal Humphrey thought the same thing, testifying that Hines "was just zoned out, [and] that's a sign that you could be under the influence of some type of narcotic or drug."[5]

Once Hines dropped the firearm, Patrolman Williams and Corporal Humphrey took him into custody. A fellow WPD officer, Patrolman Markees Gordon ("Patrolman Gordon"), responded to the scene as well, and assisted in taking Hines into custody. Patrolman Gordon conducted a pat down of Hines, placed him into a police car, and noticed that Hines appeared to be under the influence. He then transported Hines to Wilmington Hospital. At Wilmington Hospital, Hines was examined by Dr. Jonathan McGhee ("Dr. McGhee"), an emergency medicine physician. Hines told Dr. McGhee that earlier that day, he saw a movie with his girlfriend and then took phencyclidine ("PCP") after the movie

---

[4] A044 (Williams Test. at 37:2–3). As Patrolman Williams explained, "[i]t was like -- when I was standing there, it seemed like it was just going in one ear and out the other ear." *Id*. at 37:8–10. He further explained that he did not want to use force on Hines if he did not have to and that he "wanted [Hines] to comply so we could resolve this issue in a peaceful manner." *Id*. at 37:15–17.

[5] A069 (Daniel Humphrey Trial Test. at 62:15–17) [hereinafter Humphrey Test. at _].

ended.[6] Patrolman Gordon testified that he was with Hines the entire time Hines was in the hospital and that he heard Hines tell Dr. McGhee that Hines had "an argument with a female friend earlier" and that "[h]e took PCP and he had a gun."[7] Patrolman Gordon also testified that Hines had said that he took PCP around 6:30 p.m. — about an hour before the shot-spotter detected the shots fired.[8] Dr. McGhee examined Hines and determined that, by 9:30 p.m., Hines was no longer under the influence of PCP and was fit to be released back into WPD's custody. No one at Wilmington Hospital ran a chemical or blood test on Hines to see if he had PCP in his system. According to Dr. McGhee, such testing was not necessary because Hines' demeanor was calm, and several hours had passed since Hines had taken PCP. Thus, in Dr. McGhee's medical judgment, there was "no further need for medical treatment" of Hines.[9] Once Dr. McGhee cleared Hines, Patrolman Gordon transported him to WPD for booking and fingerprinting.

After Hines was taken into custody, WPD secured the scene. Patrolman Andrew Bonvetti ("Patrolman Bonvetti") taped off the scene and began inspecting for any physical evidence. Patrolman Bonvetti located three nine-millimeter shell casings in the same area as the shot-spotter notification. Master Corporal Samuel Smith ("Corporal Smith") took

---

[6] *See* A141–42 (Jonathan McGhee Trial Test. at 134:19–135:3) [hereinafter McGhee Test. at _]. The shot-spotter notification came in at 7:30 p.m. *See* A96 (Markees Gordon Trial Test. at 89:5) [hereinafter Gordon Test. at _].

[7] *See* A096 (Gordon Test. at 89:12–14).

[8] *See also* A096 (Gordon Test. at 89:1–7).

[9] *See* A143–44 (McGhee Test. at 136:23–137:1).

photographs of the three shell casings and collected them in accordance with WPD protocol. Corporal Smith took photographs of the firearm and collected it, as well.

Multiple WPD officers recounted that the firearm retrieved from the scene was in a "locked-back" position.[10] As Corporal Humphrey testified, a firearm in a locked-back position indicates that "there is no more ammunition in there and the magazine is empty."[11] A firearm in a locked-back position also indicates that the gun was recently fired. The high point nine-millimeter firearm retrieved from the scene had a single magazine. Once the firearm made its way to WPD, Detective Hugh Stephey ("Detective Stephey") of the forensic services unit's ballistics section took over the investigation.

Detective Stephey test-fired the firearm and determined that it was operable. He did not test for gunshot residue. His focus next turned to the firearm's serial number. He testified that since 1968, all firearms in the United States are required to have a serial number, which allows for them to be traced. With this particular firearm, the serial number was located underneath the gun's barrel.[12] But the serial number was obliterated — a fact that at least two WPD officers indicated was immediately obvious.[13] Detective Stephey

---

[10] *See* A073 (Humphrey Test. at 66:13); A–164 (Samuel Smith Trial Test. at 157:2) [hereinafter Smith Test. at _].

[11] *See* A073 (Humphrey Test. at 66:14–16); *see also* A164 (Smith Test. at 157:4–5) (stating that the locked-back position "means when the chamber is empty [and] it's out of rounds or bullets[.]").

[12] *See* A109 (Gordon Test. at 102:20–22).

[13] *See* A111 (Gordon Test. at 104:2–10) (agreeing that based upon his experience, the area beneath the barrel would be visibly apparent to him if he were loading or holding the gun); A184 (Hugh Stephey Trial Test. at 177:14–17) (when asked if he viewed the firearm when it came into his possession and whether it was "immediately obvious" that the serial number had been obliterated, he responded, "[y]es.") [hereinafter Stephey Test. at _]. Corporal Smith also noticed the "scratched off" serial number. *See* A165 (Smith Test. at 158:11–12).

testified that the firearm's serial number "was scraped up with some type of tool[,]" and "the polymer plastic is all chewed up, so this was deliberately done."[14]

## A. The Proceedings in Superior Court

### 1. The Jury Trial

A New Castle County grand jury indicted Hines on three charges: (1) the Serial Number Charge, (2) the Drug Charge, and (3) Discharging a Firearm on a Street.[15] A two-day jury trial followed on August 12 and 13, 2021.[16] The State called six witnesses associated with Hines' arrest and the subsequent investigation of the firearm. Hines himself did not testify, and the Superior Court conducted an on-the-record colloquy into his decision to not take the stand.

Following the State's case-in-chief, Hines' counsel moved for a motion for judgment of acquittal on the Serial Number Charge. As counsel told the Superior Court:

> The concern is Mr. Hines being found guilty just based on speculation when the evidence is not really there that he ever looked at the firearm from an angle that would allow him to see that the serial number was obliterated.[17]

The State responded and pointed to the evidence proffered during the trial and argued that "the issue of Mr. Hines' knowledge is a fact at issue within the province of the jury to decide."[18] The State acknowledged that this was "not a situation by which there is

---

[14] A186 (Stephey Test. at 179:14–16).

[15] A006–7 (Indictment).

[16] The State dropped the third charge.

[17] A196–97 (Trial Tran. at 189:20–190:2).

[18] A197 (Trial Tran. at 190:11–13).

surveillance showing Mr. Hines, for example, loading the gun, holding the gun, waving it in the air or something like that[.]"[19]  However, according to the State, "there has been testimony regarding -- from a number of officers that when they looked at it or looked at photographs of it here today in court, they believed that it was something that was immediately apparent."[20]

The court denied Hines' motion.  It first noted that, on a motion for judgment of acquittal, the court views the evidence in the light most favorable to the State.   Hines' motion, as the court aptly noted, rested on the "knowing" requirement of the Serial Number Charge, namely, whether he knew that the serial number was obliterated.  The Superior Court found that the jury had a rational basis to infer that Hines knew that the serial number had been altered.  In ruling from the bench, the trial judge reasoned:

> But the firearm in and of itself generally has a black appearance.  When we look at the photographs, for example, the one lying on the ground, you see that kind of silver on the bottom of it.  When you get closer up photographs of that in State's Exhibit-18, for instance, that silver is shown with scratches throughout and obliterates the number that was there, but it's very clear as you look at it more from the angle or from a way that one who was actually handling the weapon, obviously the rational inference is this didn't just automatically appear in Mr. Hines' hand there on the street, that he had had dealings with it before Officer Williams came across him.[21]
>
> Certainly the rational inference, as I said, [the firearm] did not just all of a sudden appear in Mr. Hines' hand right there, but that he had some dealings with it before and as some of the testimony has been perhaps loading it and things like that.  But that it is not that he's always looking at it from the top or the side or whatever, but that he has some possessory interest that is much greater than that and would, as people who own firearms or deal with

---

[19] *Id*. (Trial Tran. at 190:15–18).

[20] *Id*. (Trial Tran. at 190:19–23).

[21] A202–03 (Trial Tran. at 195:20–196:12).

firearms, had someone studied it, dealt with it, turned it, looked at it and what would be readily apparent to anyone who looked at the bottom of that more of the angle and the probably distant [*sic*] that one of those pictures was taken, particularly in State's Exhibit-18, that that number plate had been gouged at the side, had been scraped and scratched to the point that it took off the numbers. Obviously, rational inference is if he has that firearm, that he knows something about it as one who deals with firearms if you were in possession or owning them might do.[22]

Hines' knowledge was, as the court put it, a matter for "the jury to make whatever inferences that it does from the evidence, either direct or circumstantial, and the credibility of the witnesses in resolving that particular issue."[23]

### 2. *The Jury's Verdict and the Court's Sentence*

The jury returned guilty verdicts on both the Serial Number Charge and the Drug Charge. The court ordered a presentence investigation and scheduled sentencing for October 2021, pending the outcome of a different trial involving Hines.[24] Hines was sentenced on May 13, 2022. On the Serial Number Charge, Hines was sentenced to three years at Level 5, suspended for one year at Level 2. On the Drug Charge, Hines was sentenced to one year at Level 5, suspended for one year at Level 2.[25] Hines then filed a timely appeal to this Court.

### B. *Hines' Contention on Appeal*

In contesting the sufficiency of the evidence for the Serial Number Charge, Hines contends that the trial judge based his decision "on speculation that Hines must have

---

[22] A203–04 (Trial Tran. at 196:22–197:22).

[23] A206-07 (Trial Tran. at 199:20–200:1).

[24] *See* A281 (Trial Tran. at 68:2–5).

[25] *See* A283–84 (Sentence Order).

9

possessed the gun for a longer period of time without any evidence, other than a likely discharge of the weapon, to support that conclusion."[26]  The State counters that Delaware precedent does not require the State to prove possession of a firearm for any specific period of time to satisfy the knowledge element and that the evidence was sufficient.

## II.  STANDARD OF REVIEW

This court "review[s] the Superior Court's denial of a motion for judgment of acquittal *de novo* to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements, beyond a reasonable doubt."[27]  In doing so, "we do not distinguish between direct and circumstantial evidence."[28]

## III.  ANALYSIS

### A. The Trial Court Did Not Err in Denying the Motion for Judgment of Acquittal

The statute under which Hines was charged provides that:  "No person shall knowingly transport, ship, possess or receive any firearm or firearm frame or receiver *with the knowledge* that the importer's or manufacturer's serial number *has been removed,*

---

[26] Opening Br. at 10.

[27] *Howell v. State*, 268 A.3d 754, 775 (Del. 2021) (citing *Cushner v. State*, 214 A.3d 443, 446 (Del. 2019)).  *See also Ways v. State*, 199 A.3d 101, 106–07 (Del. 2018) (stating that, in reviewing an appeal from the denial of a motion for judgment of acquittal, "we examine whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find a defendant guilty beyond a reasonable doubt of all the elements of the crime.") (internal quotation marks and citation omitted).

[28] *Howell*, 268 A.3d at 775 (citing *Robinson v. State*, 953 A.2d 169, 173 (Del. 2008)).

*obliterated or altered* in a manner that has disguised or concealed the identity or origin of the firearm."[29]

We conclude that the evidence put forth by the State was sufficient to support a finding beyond a reasonable doubt that Hines knew the serial number was obliterated. When WPD officers arrived on the scene, Hines was holding the firearm in his right hand. Multiple WPD officers testified that the firearm recovered from Hines was in a "locked-back" position, indicating it had recently been fired.[30] Three shell casings — matching the same type of firearm held by Hines — were recovered in the same area the WPD officers had been directed to following the shot-spotter notification. Several WPD officers testified at trial that the firearm's obliterated serial number was easily visible or obvious, and this testimony was consistent with photographs of the firearm, introduced during the State's case-in-chief, which clearly depict the obliterated serial number.[31]

Hines contends that "there was never any evidence put forth as to how long Mr. Hines possessed the firearm."[32] But this contention ignores Patrolman Gordon's testimony that Hines told Dr. McGhee that he had an argument with a female friend earlier and that he took PCP at 6:30 p.m. and had a firearm. Although it is not clear from the record exactly when Hines first obtained the firearm, one inference that the jury could draw is that Hines

---

[29] 11 *Del. C.* § 1459(a) (emphases added). As noted above, whether Hines knew that the firearm's serial number was obliterated is the only disputed element of the charge.

[30] *See supra* note 10.

[31] *See* B1–3 (State's Exs. 16–18).

[32] Opening Br. at 9.

11

had the firearm at 6:30 p.m. when he took PCP and when he earlier argued with his female friend.

Further, the fact that Hines was found holding the gun and had likely fired it supports a reasonable inference that he had more than incidental contact with it. Thus, Hines' argument that the trial court denied the motion "based on speculation that Hines must have possessed the gun for a longer period of time without any evidence, other than a likely discharge of the weapon"[33] misses the mark. The evidence relied upon by the State and by the trial court in its ruling was not *speculation* but rather *circumstantial evidence*.[34] "This Court has consistently held that the State may prove a defendant's guilt exclusively through circumstantial evidence, and that a jury may infer intent from the defendant's conduct."[35] As the trial court ruled, it was "up to the jury to make whatever inferences that it does from

---

[33] *Id.* at 10.

[34] Even in cases where "the affirmative evidence [] is minimal and circumstantial," this Court has upheld denials of motions for judgment of acquittal because "our review is strict." *Hoennicke v. State*, 13 A.3d 744, 749 (Del. 2010). A motion for judgment of acquittal "asks whether a rational, rather than a reasonable, juror could find the defendant guilty [and is thus] a deferential standard, recognizing the jury's constitutional role as trier of fact." *Wiggins v. State*, 227 A.3d 1062, 1075 (Del. 2020) (Vaughn, J., dissenting).

[35] *Winer v. State*, 950 A.2d 642, 647 (Del. 2008) (internal citations omitted). *See also Howell*, 268 A.2d at 775 (noting that, when we inquire as to whether a jury could find the essential elements beyond a reasonable doubt, "we do not distinguish between direct and circumstantial evidence."); *State v. Newman*, 2018 WL 4692446, *5 (Del. Super. Sept. 26, 2018) (denying a motion for judgment of acquittal and holding that "[a]lthough circumstantial, that evidence was sufficient to support the jury's guilty verdict [for violating Section 1459], including on the state of mind element of the offense" where "the gun was visible and easily accessible in Newman's home, and the tool marks that filed off the serial number readily were apparent to anyone who handled the gun, [and] Newman's DNA was found in several places on the gun, permitting a reasonable inference that she had more than incidental contact with it.").

the evidence, either direct or circumstantial, and the credibility of the witness in resolving that particular issue."[36]

Accordingly, and based upon the record before us, we reject Hines' position that "[t]here is not enough known about the circumstances of Mr. Hines' possession of the firearm to permit these inferences against Mr. Hines."[37] The statute, 11 *Del. C.* § 1459, does not require the State prove a set time period for possession of a firearm, and the evidence offered by the State was sufficient to permit a rational jury, viewing the evidence in a light most favorable to the State, to find that the State met its burden of proof to show that Hines knew the serial number was obliterated.[38]

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the Superior Court's decision denying the motion for judgment of acquittal.

---

[36] A206–07 (Trial Tran. at 199:20–200:1).

[37] Reply Br. at 1.

[38] *See, e.g.*, *United States v. Green*, 2022 WL 4244275, at *3 (3d Cir. Sept. 15, 2022) (affirming denial of defendant's motion for judgment of acquittal on the charge of possession of a weapon with an obliterated serial number). There, in upholding the denial, the Third Circuit stated:

> An ATF agent testified that the serial number of the gun in question, which was conspicuously located on a silver plate on a black gun, was "directly underneath the barrel," and that ATF agent and a state police officer both testified that the scratches and gouges on the plate were easily visible. On this record, given the links between Green and the gun, a rational jury easily could have found the essential element of knowledge was satisfied beyond a reasonable doubt.

*Id*. (internal citation omitted). *See also United States v. Nesmith*, 29 F. App'x 681, 685 (2d Cir. 2002) (affirming defendant's conviction for possession of a firearm with an obliterated serial number, discussing testimony tending to show "that the extent of the obliterations was such that an individual could not handle the gun and not notice the obliteration," and concluding that this testimony "presented a sufficient basis on which a jury could conclude that Nesmith knew the serial numbers were obliterated.").